**IN THE COURT OF APPEALS OF IOWA**

No. 22-0690
Filed June 29, 2022

**IN THE INTEREST OF R.H.,**
**Minor Child**

**R.H., Father,**
　　　Appellant

_____

　　　Appeal from the Iowa District Court for Polk County, Susan Cox, District Associate Judge.


　　　A father appeals the termination of his parental rights, arguing there was insufficient evidence to support the statutory ground the juvenile court relied on for termination and that termination is not in the child's best interest. **AFFIRMED.**


　　　Stephen K. Allison of Stephen Allison Law, PLLC, Des Moines, for appellant father.

　　　Jamie F. Deremiah, Des Moines, for appellee mother.

　　　Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

　　　Erin Romar of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.


　　　Considered by Bower, C.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

A father appeals the termination of his parental rights, arguing there was insufficient evidence to support the statutory ground the juvenile court relied on for termination and that termination is not in the child's best interest. We find clear and convincing evidence supports the termination of the father's parental rights. We also find termination is in the child's best interest. We affirm.

**I.       Background Facts & Proceedings**

This family came to the attention of the Iowa Department of Human Services (DHS) because the child, born in December 2018, was exposed to the mother's substance abuse during pregnancy. The child's umbilical cord was positive for amphetamines and methamphetamine. The child was removed from parental custody and placed with the maternal grandmother. The child was adjudicated a child in need of assistance (CINA) in April 2019, pursuant to Iowa Code section 232.2(6)(c)(2), (n), and (o) (2019). DHS did not initially have concerns about the father, whose relation to the child was confirmed by paternity testing. The father engaged in services, including mental-health therapy, following a July 2019 permanency hearing.

The father committed an act of domestic abuse assault against the mother in August 2019. He pled guilty and was placed on probation. As a condition of probation, the father was required to complete a thirty-six week course, the Iowa Domestic Abuse Program (IDAP). He successfully completed the program and his probation, although his probation officer noted that the father tended to be untruthful about his relationship with the mother. While the father was in therapy

from July 2019 through March 2020, domestic violence was not addressed because the father maintained it was not an issue.

Custody of the child was transferred to the father in January 2020 subject to a transition plan. Up to that point, the father had been successfully following DHS recommendations. A six-week plan was put in place to close the case through a bridge order.[1] However, the CINA case never closed because issues arose regarding the father not following guidelines about contact with the mother. DHS remained concerned about some of the child's behavior. Relatedly, the father began to decline recommended services. For instance, the father reported that the child was having night terrors but refused the offered services to address the issue. The father also pulled the child out of daycare, which the DHS social worker testified would negatively impact the child's development. The father explained

---

[1] To qualify for a bridge order, certain criteria must be met. Section 232.103A provides:

> 1. The juvenile court may close a [CINA] case by transferring jurisdiction over the child's custody, physical care, and visitation to the district court through a bridge order, if all of the following criteria are met:
> a. The child has been adjudicated a [CINA] in an active juvenile court case, and a dispositional order in that case is in place.
> b. Paternity of the child has been legally established, including by operation of law due to the individual's marriage to the mother at the time of conception, birth, or at any time during the period between conception and birth of the child, by order of a court of competent jurisdiction, or by administrative order when authorized by state law.
> c. The child is safely placed by the juvenile court with a parent.
> d. There is not a current district court order for custody in place.
> e. The juvenile court has determined that the [CINA] case can safely close once orders for custody, physical care, and visitation are entered by the district court.
> f. A parent qualified for a court-appointed attorney in the juvenile court case.

his decision by citing safety concerns involving the COVID-19 virus. There were also concerns about how the father's anger toward the child would escalate when the child would cry. And concerns remained over the father's domestic violence. As a result, the focus of the case as it pertained to the father shifted to working on his mental health and domestic violence.

Despite DHS recommendations to continue therapy, the father stopped attending in March 2020. He was discharged due to reaching maximum benefits. The father blamed his lack of participation in therapy on losing his insurance. In May, the father perpetrated another act of violence against the mother, hitting her with a bathroom door. No criminal charges resulted from the incident. The DHS social worker assigned to the family at the time testified that they were not concerned for the child's safety then and that the father was providing minimally adequate parenting. Concerns remained related to the child's emotional well-being, most evident by the child experiencing night terrors.

The father committed another act of domestic violence against a woman in front of the child in March 2021. An altercation ensued with the police, which resulted in the father requiring medical treatment at a hospital. Once he was discharged, he returned to the woman's apartment despite a no-contact order and threatened to kill her. The incident resulted in the father pleading guilty to domestic abuse assault and interference with official acts resulting in bodily injury. He was again placed on probation and required to complete another course of IDAP. At the time of trial, he had completed six of the required thirty-six classes.

The child was removed from the father's custody in March and placed back with the maternal grandmother, where he remained for the rest of the proceedings.

The father had two supervised visits a week and also exercised additional visits supervised by his sister. He was consistent in his supervised visitation with the child.

The father and DHS had a tenuous relationship, particularly following the failure of the January 2020 six-week transition plan. The DHS social worker that worked with the family until August 2021 testified that monthly meetings sometimes "escalated very quickly" even when the child was present. Such behavior intensified concerns about the father's ability to manage his anger. On at least one occasion, DHS employees had to terminate a phone call because the father was "escalating." This coincided with the father's refusal of all services until late September or early October 2021 when he reengaged with therapy. The therapist indicated that the father had good attendance and participation following reengagement but had problems taking responsibility for his actions.

The father began a relationship with a woman in May 2021. That woman was involved with DHS due to substance abuse and unsafe conditions for children at home related to an unsanitary environment. He moved in with her around July, and they are now engaged. The woman's DHS case was closed in October.

Questions arose at trial over potential substance abuse by the father. He had a prescription for hydrocodone due to back pain and fibromyalgia. He tested positive for morphine in December 2020. It is unclear from the record before us whether hydrocodone could result in a positive drug test for morphine. A DHS social worker testified that there were behavioral indicators of substance abuse in the summer of 2021, including the father appearing very thin, being unable to sit still, and having dilated eyes. He also refused a hair drug test, resulting in a

presumptive positive test. His probation officer testified, however, that he did not have facts before him that would suggest the father used illegal substances.

The State filed a petition to terminate the mother's and father's parental rights in December 2021. In particular, the State cited the father's unresolved issues with substance abuse, mental health, and domestic violence. Following the hearing, the court terminated both parent's rights pursuant to Iowa Code section 232.116(1)(h) (2021). The father appeals.[2]

## II. Standard of Review

"We review proceedings to terminate parental rights de novo. We give weight to the juvenile court's factual findings, especially when considering the credibility of witnesses, but we are not bound by them." *In re A.B.*, 815 N.W.2d 764, 773 (Iowa 2012) (internal citation omitted) (quoting *In re H.S.*, 805 N.W.2d 737, 745 (Iowa 2011)). "We will uphold an order terminating parental rights if there is clear and convincing evidence of grounds for termination under Iowa Code section 232.116." *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010).

## III. Discussion

The father appeals the juvenile court's ruling, alleging the State did not establish a ground for termination. He also claims termination is not in the child's best interests.[3]

We use a three-step analysis to review termination of parental rights. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). "First, we 'determine whether any ground

---

[2] The mother does not appeal the termination of her parental rights.
[3] The father's petition on appeal does not separate his best-interest argument from his statutory-grounds argument. But we choose to address the best interest argument under Iowa Code section 232.116(2).

for termination under 232.116(1) has been established.'" *Id.* at 472-73 (quoting *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016)). If a ground is established, we must determine whether termination is in the child's best interest under section 232.116(2). *Id.* at 473. Finally, we consider whether an exception to termination under 232.116(3) exists. *Id.* Because the father does not allege an exception to termination is applicable, we need not consider that step of our analysis. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010).

### A.    Statutory Ground for Termination

The father claims insufficient evidence exists to support the juvenile court's decision to terminate his parental rights under section 232.116(1)(h).[4] In particular, the father contends that the State did not provide clear and convincing evidence that the child could not be returned to his custody.[5] Termination is appropriate under section 232.116(1)(h) when returning the child to the custody of the parent

---

[4] Section 232.116(1)(h) provides for termination of parental rights when:
    (1) The child is three years of age or younger.
    (2) The child has been adjudicated a [CINA]  pursuant to section 232.96.
    (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
    (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

[5] The State argues the father's request for an immediate return of the child to his custody is unpreserved because he only argued for a six-month extension at trial. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) (explaining that appellate review is generally limited to matters raised and decided at the trial court level). While the father did testify as the State suggests, he also argued for an immediate return of the child in his written closing argument. In any event, given the important interests involved, we address the father's argument challenging the statutory grounds.

would result in adjudicatory harm "at the present time," which means at the time of the termination hearing. *In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014). Thus, to the extent the father claims DHS wrongfully failed to follow the case plan set out at the January 2020 dispositional hearing to return custody of the child in six weeks, the matter is moot because we must determine if the child could be safely returned at the time of the termination hearing in January 2022, not two years prior.

The juvenile court found the child could not safely be returned due to the father's ongoing issues with mental health, domestic violence, and a lack of a protective capacity toward the child. The father highlights that past performance by a parent may be indicative of future behavior. *See In re M.S.*, 519 N.W.2d 398, 400 (Iowa 1994). He suggests his roughly fifteen months with the child from January 2020 through March 2021 shows he is capable of safely parenting. However, such a conclusion overlooks significant portions of the record before us.

First, the father has had three instances of domestic violence since the case began, two of which resulted in criminal convictions. The second prosecuted incident occurred after the father completed a thirty-six week IDAP course. And while the father contends he has made improvements in regulating his behavior, he refused to take responsibility for the second offense at the termination hearing, largely denying the factual basis for the convictions and alleging he only pled guilty to get the process over with. *See In re D.D.*, 955 N.W.2d 186, 193 (Iowa 2021) (noting the importance of acknowledging abuse before meaningful change can occur).

While the father's physical violence has not been directed at the child, that does not mean his actions are without consequence. Our supreme court has

recognized many detrimental effects on children living in domestically violent households, including an increased risk of becoming a victim of abuse, decreased social competency, and the potential for post-traumatic stress disorder. *In re L.H.*, 904 N.W.2d 145, 153 (Iowa 2017); *see also In re J.R.*, No. 17-0556, 2017 WL 2684405, at *3 (Iowa Ct. App. June 21, 2017) ("Children raised in homes touched by domestic abuse are often left with deep scars, revealed in the form of increased anxiety, insecurity, and a greater likelihood for later problems in interpersonal relationships" (quoting *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994))).

The domestic violence is indicative of the father's mental-health issues, which generally relate to the father's inability to manage his emotions and anger. Testimony revealed the father had a tumultuous relationship with DHS that at times caused him to become "very escalated" with providers, sometimes in front of the child. He became angry easily with his child when the child was upset or crying. While he was discharged from therapy for reaching maximum benefits in March 2020, that therapy did not address his issues relating to domestic violence. And the father did not reengage in therapy until late September 2021.

We agree that the father lacks the protective capacity necessary to return the child to his care. Despite the father identifying behavioral concerns about the child, including night terrors, the father failed to search for or obtain appropriate resources for resolving the issue. He also began a new relationship with a woman in May who had her own DHS case related to substance abuse and an unsafe household. The father's choice to engage in that relationship despite the evident risks it would pose to his child demonstrates a lack of protective capacity.

Finally, the father testified that he could not regain custody now. He indicated that he had additional work to do on his mental health and regulating his emotions, as well as needing more time to prepare a home. Because section 232.116(1)(h) requires us to consider whether the child could be returned "at the present time," we find the juvenile court correctly found clear and convincing evidence supporting termination.

### B. Best Interest of the Child

The father also claims that termination would not be in the child's best interest. When considering the best interest of the child, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2).

Termination is in the child's best interest. The father has unresolved issues involving mental health and domestic violence that place the child at risk. He also lacks the protective capacity to ensure the child's long-term safety and growth. Moreover, the child is particularly vulnerable given his young age. The child has spent roughly half of his young life in the care of his maternal grandmother. The child has done well developmentally in this placement and the placement is willing to adopt the child. See Iowa Code § 232.116(2)(b). Termination is in the child's best interest.

**AFFIRMED.**